**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| FERRIS MFG. CORP.,<br><br>Plaintiff,<br><br>v.<br><br>ROY CARR AND CURALINE, INC.,<br><br>Defendants. | **CASE NO.**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF FERRIS MFG. CORP.'S ORIGINAL COMPLAINT**

Plaintiff Ferris Mfg. Corp. ("Ferris"), through its attorneys, brings this action against Defendants Roy Carr ("Carr") and Curaline, Inc. ("Curaline") (collectively, "Defendants") for breach of fiduciary duty, breach of contract and false designation of origin under the Lanham Act.

**NATURE OF THE ACTION**

1. This is an action for breach of fiduciary duty, breach of contract and designation of false origin under 15 U.S.C. § 1125(a).

2. In breach of his fiduciary duties as one of Ferris's most senior officers, defendant Roy Carr intentionally and fraudulently misappropriated Ferris's confidential and proprietary information, improperly filed a patent application with the United States Patent and Trademark Office ("USPTO") based on this information and, through defendant Curaline, now competes against Ferris by offering to sell and providing samples of a product incorporating this information. Accordingly, Ferris brings this action for actual and punitive damages, restitution, a constructive trust, an accounting, injunctive relief and other relief.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) and 15 U.S.C. § 1121 because this action arises under the Lanham Act.

4. In addition, this Court has supplemental jurisdiction over the non-federal claims under 28 U.S.C. § 1367 because the Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b), and because the non-federal claims are so related to the Federal claims that they form part of the same case or controversy.

5. This Court has personal jurisdiction over Carr and Curaline because they reside in Illinois, transact business in Illinois and committed torts in Illinois.

6. Venue is proper in this Court under 28 U.S.C. § 1391(b).

**THE PARTIES**

7. Ferris is a Delaware corporation with its principal place of business at 5133 Northeast Parkway, Fort Worth TX 76106.

8. Upon information and belief, Roy Carr is Chief Operating Officer at Curaline and Vice President Business Development at Quick-Med Technologies, Inc. Carr was previously a core member of Ferris's upper management and was privy to Ferris's highly confidential business, financial and legal strategies. Carr is a resident of Illinois, whose address is 8255 Steepleside Drive, Burr Ridge IL 60527.

9. Curaline is a Delaware corporation with its principal place of business at 16W235 83rd Street, Burr Ridge IL 60527.

**FERRIS' INNOVATIVE WOUND CARE PRODUCTS**

10. Founded in 1977, Ferris develops and sells innovative wound care products that bring desired and effective results to the healing process.

11. Ferris has received numerous awards including the KPMG Peat Marwick High Tech Entrepreneur Award, the Medical Device and Diagnostic Industry's Medical Design Excellence Awards® 2000, Industry Week's Top 25 Growing Companies Award in 2000, and the Illinois Governor's Export Award for 1998 and 1999.

12. Ferris manufacturers and distributes PolyMem®, Shapes® and SportsWrap™ wound care dressings, among other branded products.

13. PolyMem's formulation was first invented by the late Robert W. Sessions ("Mr. Sessions"), a former Director of Biomedical Research at Chicago's Rush-Presbyterian St. Luke's Medical Center. Mr. Sessions was the founder and former President and CEO of Ferris. He filed multiple patents on the formulation and methods of use for wound care products.

14. PolyMem dressings comprise an innovative class of multifunctional wound care dressings. These polymeric membrane dressings effectively cleanse, fill, absorb and moisten wounds throughout the healing continuum. No other single wound dressing combines these key wound-healing capabilities like PolyMem. PolyMem thus eliminates the need for multiple wound care products.

15. PolyMem dressings are indicated for virtually all wound types (*e.g.*, full and partial thickness wounds, skin tears, ulcers, surgical wounds, and first- and second-degree burns). The PolyMem family of dressings can be used as primary dressings, secondary dressings or a combination of both to support the entire healing continuum.

16. The PolyMem formulation keeps the wound bed moist and promotes the concentration of the body's naturally produced growth factors, nutrients and regenerated cells in the wound bed. As a result, clinical studies show PolyMem dressings offer quicker wound recovery times than traditional dressings and have been found to heal wounds that had previously

been unsuccessfully treated.

**CARR AND HIS FIDUCIARY ROLE IN FERRIS'S SENIOR MANAGEMENT**

17. In August 1987, Carr became a chemical consultant for Ferris. Thereafter, he became a full-time Ferris employee and quickly became part of Ferris's upper management, interacting directly with Mr. Sessions, then Ferris's President and CEO. In December 1991, Carr held the title of Manager, reporting directly to Mr. Sessions. By 1993, Carr had become Ferris's General Manager, and in April 1996, Carr became "Advisor to President" Sessions.

18. As a member of Ferris's senior management team, Carr was heavily involved with the conception, development and commercialization of Ferris's patent portfolio concerning wound dressings. Indeed, Carr was a co-inventor on the following Ferris patents relating to wound dressings: U.S. Patent Nos. 6,794,554; 5,916,928; 5,605,165; 5,254,301; 5,065,752; 5,064,653.

19. In addition to his work as a co-inventor and developer of Ferris's wound dressings, Carr was responsible for Ferris's patent procurement program. In this role, he closely worked with other Ferris inventors (including Mr. Sessions) and Ferris's outside patent counsel regarding Ferris's patent - strategies. He also assisted counsel in responding to Office Actions from the United States Patent and Trademark Office ("USPTO"), including analyzing the scope of the proposed patent claims and third-party patents and other references relating to Ferris's pending patent applications.

20. Carr also regularly communicated with the Food and Drug Administration on Ferris's behalf. In particular, he responded to the FDA's comments regarding Ferris's labeling for PolyMem. In addition, he was involved with Ferris's product certification registration. Carr also regularly corresponded with potential clients regarding pricing and cost of Ferris's wound dressings. Moreover, he was responsible for Ferris's proprietary manufacturing operations and

methods of productions.

21. In June 1999, Carr became Vice President of Operations and General Manager of Ferris. In this role, he was responsible for, among other things, applying for and following up with patent applications and other legal issues.

22. Carr also was involved in the development of new Ferris products. Indeed, one of Carr's objectives was to introduce new products.

23. As Vice President of Operations and General Manager, Carr was responsible for protecting Ferris's confidential information. He regularly signed Ferris's Visitors' Agreements Regarding Confidentiality and Nondisclosure on behalf of the company, which acknowledged that visitors to Ferris could view "certain confidential information, techniques and specific parameters used in medical device or other manufacturing . . . ." Ferris required its visitors to "maintain all knowledge of such Confidential information in strict confidence."

24. As Vice President of Operations and General Manager of Ferris, Carr also was responsible for monitoring Ferris employees' obligation to keep its proprietary information confidential. For example, on September 19, 2000, Carr issued a "Memorandum to All [Ferris] Employees regarding Ferris Confidential Information," stating:

> [A]ll employees have an obligation to hold in strictest confidence the Company's trade secrets and other proprietary or confidential business information; an obligation not to use the Company's trade secrets and other proprietary or confidential business information for their own benefit or for the benefit of others; and an obligation not to reveal, divulge, or disclose the Company's trade secrets and other proprietary or confidential business information to any person, firm or corporation without the written authorization of an officer of Ferris.

(Ex. A, 9/19/00 Carr Memorandum).

25. As Vice President of Operations and General Manager, Carr also was heavily involved in Ferris's day-to-day management. For example, he signed Domestic Distribution

Agreements on Ferris's behalf and participated in managerial review of Ferris's product development.

26. In 2002, Carr became Ferris's Chief Operating Officer, second only to Mr. Sessions, and in April 2003 he became "Aide to CEO" Sessions.

**CARR REPEATEDLY AGREES TO PROTECT FERRIS'S CONFIDENTIAL INFORMATION AND ASSIGN INVENTIONS TO FERRIS**

27. From the time he first worked with Ferris as a consultant, Carr acknowledged that "during the course of [his] association with Ferris, [he] may acquire or have access to information that is confidential and of great value to Ferris" . . . including "research and/or development projects as well as data relating to them" and "formulations, designs, products, processes, supplies, [and] methods of manufacture . . . ." (Ex. B, 8/6/87 Nonemployee Security Agreement ¶1(a)). He promised to "use Ferris' confidential information only for the direct and sole benefit of Ferris . . . [and] not disclose Ferris' confidential information to others without the express written authorization of Ferris." (*Id.* ¶1(b)). He also promised "not to show or display to any third party" any "drawings, samples, prototypes, products or equipment" that incorporates "Ferris' specifications or ideas or technology." (*Id.* ¶3).

28. Moreover, as Vice President of Operations and General Manager, Carr was responsible for administering the "Ferris Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement," which all current and future Ferris employees, including Carr, were required to sign. That agreement required all employees to assign their rights, title and interest in any inventions conceived, developed or reduced to practice during employment that relate to Ferris' business and were developed on Ferris' time or with Ferris "equipment, supplies, facilities or trade secret information" or "which resulted from any work . . . performed for Ferris." (Ex. C at ¶ 2.2(a)).

29. Under the Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement, employees also recognized "that Inventions relating to my activities while working for Ferris and conceived by me . . . *within one year after termination of my employment . . . shall be presumed to have been conceived during my employment with Ferris and are to be assigned to Ferris as a Ferris invention* . . . ." (*Id.* ¶ 2.2(b)) (emphasis added).

30. As Vice President of Operations and General Manager, Carr regularly signed the Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement on Ferris's behalf. (*See Id.*).

31. On several occasions during his employment at Ferris, Carr also acknowledged receipt of the Ferris Employee Handbook. These Handbooks acknowledged that "[e]mployees of Ferris will have access to confidential information. We believe the employment relationship creates a relationship of trust with respect to any information regarding the business of Ferris. . . ." (*See, e.g.*, Ex. D, April 2003 Ferris Employee Handbook).

**CARR BREACHES HIS EMPLOYMENT CONTRACT AND MISAPPROPRIATES FERRIS CONFIDENTIAL KNOWHOW IMMEDIATELY AFTER LEAVING FERRIS**

32. Carr left Ferris on June 6, 2003.

33. A little over *one* month later, on July 16, 2003, Carr and another former Ferris employee, George Worthley, filed a confidential provisional patent application with the USPTO, No. 60/487,666 for "Novel Polyurethane Formulations and Applications." On June 30, 2004, Carr filed a continuing application claiming the benefit of Provision Appl. 60/487,666 for a "Foam-layered dressing, a method for making the same, a method for applying a dressing, a foam composition, and a foam layer composition produced by a process." (Ex. E, Pub. No. US2005/0013987 ("'987 Patent Application")). In the '987 Patent Application, Carr claimed he had invented a two-layer foam dressing:

> 1. A foam-layered dressing prepared by a process comprising the steps of:
>
> (a) providing a first foam layer;
>
> (b) adding a slurry over the first foam layer wherein the slurry comprises a surfactant, an absorbent, a plasticizer and an active agent;
>
> (c) curing the slurry and the first foam layer; and
>
> (d) drying the slurry and the first foam layer until the slurry forms a second foam layer which attaches to the first foam layer.

*(Id.* at 5). In the prosecution of this application, the Patent Examiner cited several Ferris patents as prior art, including U.S. Patent Nos. 5,064,653, 5,065,752, and 5,916,928. Carr was the co-inventor on each of these patents.

34. The '987 Patent Application disclosed Ferris's confidential know-how, methods and procedures. Carr derived the dual-layered foam dressing claimed in the '987 Patent Application from his work at Ferris. As Ferris's Vice President of Operations and General Manager, Carr was regularly exposed to this Ferris confidential information. In particular, under Carr's direction, Ferris had developed and tested a dual-layer foam wound dressing that administered a drug.

35. Given the nature of the technology and polyurethane material involved, it would have been impossible for Carr to have independently invented and reduced to practice his alleged invention in the little over one month between when he left Ferris and filed the '987 Patent Application.

36. The USPTO agreed that Carr's purported invention in the '987 Patent Application incorporated Ferris's proprietary know-how. Although not cited by Carr and Worthley, the USPTO twice rejected claim 1 of Carr's patent application as anticipated and obvious over Ferris's 5,254,301 patent.

37. Because the patent application process is not open to the public, Ferris was not

aware Carr had filed the ’987 Patent Application. Ferris also was not aware Carr had misappropriated Ferris’s confidential information after he left Ferris. To the contrary, Ferris assumed that Carr abided by his contractual and fiduciary duties to the company. Thus, Ferris had no duty to inquire whether Carr had filed a patent application based on Ferris confidential information and know-how.

38. On information and belief, Carr and Worthley assigned their rights in the ’987 Patent Application to RC Medical, LLC. Carr was the President of RC Medical, LLC. In September, 2005, RC Medical filed a Correction of Ownership, removing Worthley as an inventor of the ’987 Patent Application. The ‘987 Patent Application was later abandoned.

**FERRIS DISCOVERS CARR**
**MISAPPROPRIATED ITS CONFIDENTIAL INFORMATION**

39. Upon information and belief, in November 2012, Carr became the Chief Operating Officer of Curaline.

40. Curaline recently began to market wound dressings, DevraSorb. DevraSorb Prime is “a layered foam product” “used for deep wounds.” (Ex. F, DevraSorb™ Innovative Foam Dressings at 2).

41. In its marketing materials, Curaline claims its DevraSorb Prime contains “two layers” to “absorb[] and hold[] significantly more fluid.” (*Id.*).

42. Both Curaline’s marketing literature and its website claim “[a]ll DevraSorb products are patent-pending.” (*Id.*; http://www.curaline.com/#!curaline-dievrasorb/c1jpw). The literature and website also state: “Curaline is on the front line of wound care with innovative ideas” and “dressings contain[ing] unique chemical compounds. . . .” (*Id.* at 4).

43. In its November 30, 2012 510(k) submission to the Department of Health and Human Services, Curaline claimed DevraSorb was the “substantial equivalent” to PolyMem,

listing PolyMem as its "principal predicate."

44. In mid-2013, Ferris discovered Carr was working at Curaline and that Curaline intended to offer a product similar to PolyMem. Upon learning Carr had joined Curaline, in June 2013, counsel for Ferris wrote a letter to Curaline's Chief Executive Officer, Haitham Matloub, advising him of Carr's ongoing duty to keep confidential Ferris's proprietary information. Counsel for Ferris also wrote to Carr individually to remind him of that duty.

45. Curaline responded, denying any impropriety, but it failed to disclose that Carr had filed any patent applications upon leaving Ferris. Thus, both Carr and Curaline actively misled Ferris, took active steps to prevent Ferris from learning about their misappropriation and fraudulently concealed that they had misappropriated Ferris's confidential information and know-how.

46. In November 2013, Ferris discovered Carr and Curaline were marketing DevraSorb. At the Medica trade show in Germany, Ferris obtained DevraSorb marketing material that claimed its products were "patent-pending." (Ex. F at 2). Jeffrey Dziura, Curaline's Vice President of Sales and Marketing, also told a Ferris associate that Curaline had more "patent-pending" products in it "pipeline."

47. In December 2013, Ferris began investigating Curaline's claims that its products were "patent-pending," which led to its discovery that Carr had misappropriated Ferris' confidential know-how that he had acquired while he was in Ferris' senior management. In particular, in December 2013, Ferris first discovered that Carr had filed the '987 Patent Application that incorporated Ferris's confidential proprietary dual-layer foam wound dressing.

**COUNT I – BREACH OF FIDUCIARY DUTY BY CARR**

48. Ferris incorporates by reference, as though specifically pleaded herein, the allegations of each of the preceding paragraphs.

49. As Ferris's Vice President of Operations and General Manager, Carr owed Ferris a fiduciary duty of loyalty, fairness and honesty not to allow his personal interests to prevail over the interests of Ferris or usurp Ferris' corporate opportunity for personal gain or misappropriate a business opportunity or confidential information that properly belongs to Ferris. This duty continued after his termination because he began the exploitation before he resigned and it was based on confidential information learned while he was employed by Ferris and unlawfully took from Ferris when he left the company. In particular, Carr breached his fiduciary duty to Ferris by using Ferris company know-how, facilities or equipment while still employed by Ferris to develop a new business and make a profit for himself at Ferris's expense.

50. Carr willfully and deliberately breached his fiduciary duty to Ferris by misappropriating Ferris confidential and proprietary information he learned of while employed by Ferris and incorporating it in the provisional application he filed in July 2003, which resulted in the '987 Patent Application and which Curaline has incorporated into its DevraSorb product.

51. Both Carr and Curaline purposefully concealed Carr's breach of fiduciary duty. As discussed above, Ferris contacted both Carr and Curaline as soon as it discovered Carr was working at Curaline and that Curaline intended to offer a product similar to PolyMem. Curaline responded, denying any impropriety, but it failed to disclose that Carr had filed any patent applications upon leaving Ferris. Ferris reasonably relied upon Carr's and Curaline's representations that its new product, which was not yet on the market, did not incorporate any of Ferris's confidential information and know-how. By failing to inform Ferris of Carr's prior patent

applications, both Carr and Curaline fraudulently concealed that they had misappropriated Ferris's confidential information and know-how.

52. Carr's breach of fiduciary duty was also inherently undiscoverable. The '987 Patent Application was confidential when Carr filed it. There is no way that Ferris could have discovered Carr's misappropriation of its confidential information and know-how before Curaline began marketing Devrasorb in 2013.

53. Ferris has been, and will continue to be, substantially and irreparably injured by Carr's willful and deliberate breach of his fiduciary duty because sales of Ferris' PolyMem product have been diverted by the sale of Curaline's DevraSorb.

54. Carr's willful breach of his fiduciary duty to Ferris is the proximate cause of Ferris's injury, which is objectively verifiable.

## COUNT II – BREACH OF CONTRACT BY CARR

55. Ferris incorporates by reference, as though specifically pleaded herein, the allegations of each of the preceding paragraphs.

56. Carr entered into an Employee Confidentiality, Assignment of Inventions and Nonsoliciation Agreement with Ferris in which he agreed to assign any inventions developed during his employment and one year after his termination to Ferris.

57. Carr breached that agreement by filing a provisional patent application containing Ferris' confidential and proprietary information just over one month after leaving Ferris; filing a continuing application based on that provisional application and disclosing that confidential information to Curaline.

58. Both Carr and Curaline purposefully concealed Carr's breach of contract. As discussed above, Ferris contacted both Carr and Curaline as soon as it discovered Carr was

working at Curaline and that Curaline intended to offer a product similar to PolyMem. Curaline responded, denying any impropriety, but it failed to disclose that Carr had filed any patent applications upon leaving Ferris. Ferris reasonably relied upon Carr's and Curaline's representations that its new product, which was not yet on the market, did not incorporate any of Ferris's confidential information and know-how. By failing to inform Ferris of Carr's prior patent applications, both Carr and Curaline fraudulently concealed that they had misappropriated Ferris's confidential information and know-how.

59. Carr's breach of contract was also inherently undiscoverable. The '987 Patent Application was confidential when Carr filed it. Furthermore, there is no way that Ferris could have discovered Carr's misappropriation of its confidential information and know-how before Curaline began marketing Devrasorb in 2013.

60. Carr's breach injured Ferris because sales of its PolyMem product are being diverted to Curaline because its confidential information has been incorporated into Curaline's DevraSorb product.

61. Carr's breach of contract is the proximate cause of Ferris's injury, which is objectively verifiable.

**COUNT III – 15 U.S.C. § 1125(a) FALSE DESIGNATION OF ORIGIN BY CURALINE**

62. Ferris repeats and hereby incorporates by reference, as though specifically pleaded herein, the allegations of each of the preceding paragraphs.

63. By representing to the market that its DevraSorb products are innovative and unique, Curaline has falsely represented the origin and nature of DevraSorb products in violation of 15 U.S.C. § 1125(a). Further, Curaline has falsely designated the origin of the DevraSorb

products by failing to disclose that they are based on or derived from know-how that Carr had misappropriated from Ferris.

64. Curaline has caused its advertisements and DevraSorb products to enter interstate commerce by offering them for sale on the Internet and at national and international industry trade shows.

65. Ferris has been and will be substantially and irreparably injured by the sale of DevraSorb products because sales of its PolyMem products have been diverted to Curaline.

**RELIEF REQUESTED**

WHEREFORE, Ferris requests that the Court enter a judgment in its favor and against Defendants, and:

A. Find that Carr willfully and deliberately breached his fiduciary duty to Ferris;

B. Find that Carr be liable for all damages suffered by Ferris resulting from his breach of fiduciary duty;

C. Find that Carr be liable for punitive damages as a result of his breach of fiduciary duty;

D. Order an accounting, restitution and the imposition of a constructive trust relating to all property, confidential information or know-how misappropriated or derived from Ferris.

E. Order that Carr and Curaline, its officers, agents, and employees, and those persons in active concert or participation with any of them, and their successors and assigns be permanently enjoined from using all property, confidential information or know-how misappropriated or derived from Ferris;

F. Find that Carr breached his Employee Confidentiality, Assignment of Inventions and Nonsoliciation Agreement with Ferris;

G. Find that Carr be liable for all damages suffered by Ferris resulting from his breach of contract;

H. Find that Curaline's representation of DevraSorb as "patent-pending" constitutes a false designation of origin in violation of 15 U.S.C. § 1125(a) and common law;

I. Find that, under 15 U.S.C. § 1117, Defendants be held liable for all damages (including treble damages) suffered by Ferris resulting from the acts alleged herein;

J. That, pursuant to 15 U.S.C. § 1117, Defendants be compelled to account to Ferris for any and all profits derived by it from its illegal acts complained of herein;

K. That Defendants be required to pay Ferris' costs, expenses, and reasonable attorneys' fees in connection with this action, as provided in 15 U.S.C. § 1117;

L. That Ferris be awarded its lost profits resulting from Defendants' wrongful acts; and

M. That Ferris be awarded such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Ferris hereby demands a trial by jury on all issues so triable.

Dated: June 20, 2014

Respectfully submitted,

*/s/ Michael J. Abernathy*

Michael J. Abernathy
mike.abernathy@klgates.com
Margaret A. McGreal
margaret.mcgreal@klgates.com
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
(312) 372-1121

**ATTORNEYS FOR PLAINTIFF**
**FERRIS MANUFACTURING CORP.**