# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FERRIS MFG. CORP.,

             Plaintiff,

    v.

ROY CARR AND CURALINE, INC.,

             Defendants.

CASE NO. 1:14-CV-4663

## DEFENDANTS ROY CARR AND CURALINE, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF FERRIS MFG. CORP.'S ORIGINAL COMPLAINT

As and for their Answer and Affirmative Defenses to the Complaint of Plaintiff Ferris Mfg. Corp. ("Ferris"), Defendants Roy Carr ("Carr") and Curaline, Inc. ("Curaline" and, collectively with Carr, "Defendants") state as follows:

### NATURE OF THE ACTION

**ALLEGATION NO. 1:**

This is an action for breach of fiduciary duty, breach of contract and designation of false origin under 15 U.S.C. § 1125(a).

**ANSWER:**

Defendants admit that Ferris purports to state claims for breach of fiduciary duty, breach of contract and designation of false origin under 15 U.S.C. § 1125(a). Defendants deny all remaining allegations contained in this paragraph.

**ALLEGATION NO. 2:**

In breach of his fiduciary duties as one of Ferris's most senior officers, defendant Roy Carr intentionally and fraudulently misappropriated Ferris's confidential and proprietary information, improperly filed a patent application with the United States Patent and Trademark Office ("USPTO") based on this information and, through defendant Curaline, now competes against Ferris by offering to sell and providing samples of a product incorporating this information. Accordingly, Ferris brings this action for actual and punitive damages, restitution, a constructive trust, an accounting, injunctive relief and other relief.

**ANSWER:**

Defendants admit that Carr was once a senior officer at Ferris (although not an official officer listed in corporate filings). Defendants deny all remaining allegations in this paragraph.

## JURISDICTION AND VENUE

**ALLEGATION NO. 3:**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) and 15 U.S.C. § 1121 because this action arises under the Lanham Act.

**ANSWER:**

Defendants admit that this Court has subject matter jurisdiction. Defendants deny all remaining allegations in this paragraph.

**ALLEGATION NO. 4:**

In addition, this Court has supplemental jurisdiction over the non-federal claims under 28 U.S.C. § 1367 because the Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b), and because the non-federal claims are so related to the Federal claims that they form part of the same case or controversy.

**ANSWER:**

Defendants admit that this Court has supplemental subject matter jurisdiction over Ferris's purported non-federal claims. Defendants deny all remaining allegations in this paragraph.

**ALLEGATION NO. 5:**

This Court has personal jurisdiction over Carr and Curaline because they reside in Illinois, transact business in Illinois and committed torts in Illinois.

**ANSWER:**

Defendants admit that this Court has personal jurisdiction over them because they reside and transact business in Illinois. Defendants deny all remaining allegations in this paragraph.

**ALLEGATION NO. 6:**

Venue is proper in this Court under 28 U.S.C. § 1391(b).

**ANSWER:**

Defendants admit that venue in this Court is proper. Defendants deny all remaining allegations in this paragraph.

## THE PARTIES

**ALLEGATION NO. 7:**

Ferris is a Delaware corporation with its principal place of business at 5133 Northeast Parkway, Fort Worth TX 76106.

**ANSWER:**

Defendants admit, on information and belief, the allegations in this paragraph.

**ALLEGATION NO. 8:**

Upon information and belief, Roy Carr is Chief Operating Officer at Curaline and Vice President Business Development at Quick-Med Technologies, Inc. Carr was previously a core member of Ferris's upper management and was privy to Ferris's highly confidential business, financial and legal strategies. Carr is a resident of Illinois, whose address is 8255 Steepleside Drive, Burr Ridge IL 60527.

**ANSWER:**

Defendants admit that Carr (i) is Curaline's Chief Operating Officer and (ii) resides at 8255 Steepleside Drive, Burr Ridge, Illinois 60527. Defendants further admit that Carr was previously a Vice President Business Development at Quick-Med Technologies, Inc. and a member of Ferris's management. Carr denies that he was "privy to Ferris's highly confidential business, financial and legal strategies," and Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of these allegations. Defendants further deny the remaining allegations in this paragraph.

**ALLEGATION NO. 9:**

Curaline is a Delaware corporation with its principal place of business at 16W235 83rd Street, Burr Ridge IL 60527.

**ANSWER:**

Defendants admit the allegations in this paragraph.

## FERRIS'S INNOVATIVE WOUND CARE PRODUCTS

**ALLEGATION NO. 10:**

Founded in 1977, Ferris develops and sells innovative wound care products that bring desired and effective results to the healing process.

**ANSWER:**

Defendants admit, on information and belief, that Ferris develops and sells wound care products. Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph.

**ALLEGATION NO. 11:**

Ferris has received numerous awards including the KPMG Peat Marwick High Tech Entrepreneur Award, the Medical Device and Diagnostic Industry's Medical Design Excellence Awards® 2000, Industry Week's Top 25 Growing Companies Award in 2000, and the Illinois Governor's Export Award for 1998 and 1999.

**ANSWER:**

Carr admits, on information and belief, the allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

**ALLEGATION NO. 12:**

Ferris manufacturers and distributes PolyMem®, Shapes® and SportsWrap™ wound care dressings, among other branded products.

**ANSWER:**

Defendants admit, on information and belief, the allegations in this paragraph.

**ALLEGATION NO. 13:**

PolyMem's formulation was first invented by the late Robert W. Sessions ("Mr. Sessions"), a former Director of Biomedical Research at Chicago's Rush-Presbyterian

St. Luke's Medical Center. Mr. Sessions was the founder and former President and CEO of Ferris. He filed multiple patents on the formulation and methods of use for wound care products.

**ANSWER:**

Carr admits, on information and belief, the allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

**ALLEGATION NO. 14:**

PolyMem dressings comprise an innovative class of multifunctional wound care dressings. These polymeric membrane dressings effectively cleanse, fill, absorb and moisten wounds throughout the healing continuum. No other single wound dressing combines these key wound-healing capabilities like PolyMem. PolyMem thus eliminates the need for multiple wound care products.

**ANSWER:**

Defendants admit, on information and belief, that PolyMem dressings comprise a class of polymeric membrane dressings. Defendants deny that "[n]o other single wound dressing combines these key wound-healing capabilities like PolyMem." Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this paragraph.

**ALLEGATION NO. 15:**

PolyMem dressings are indicated for virtually all wound types (*e.g.*, full and partial thickness wounds, skin tears, ulcers, surgical wounds, and first- and second-degree burns). The PolyMem family of dressings can be used as primary dressings, secondary dressings or a combination of both to support the entire healing continuum.

**ANSWER:**

Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

CHICAGO/#2663075.1

**ALLEGATION NO. 16:**

The PolyMem formulation keeps the wound bed moist and promotes the concentration of the body's naturally produced growth factors, nutrients and regenerated cells in the wound bed. As a result, clinical studies show PolyMem dressings offer quicker wound recovery times than traditional dressings and have been found to heal wounds that had previously unsuccessfully treated.

**ANSWER:**

Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

### CARR AND HIS FIDUCIARY ROLE IN FERRIS'S SENIOR MANAGEMENT

**ALLEGATION NO. 17:**

In August 1987, Carr became a chemical consultant for Ferris. Thereafter, he became a full-time Ferris employee and quickly became part of Ferris's upper management, interacting directly with Mr. Sessions, then Ferris's President and CEO. In December 1991, Carr held the title of Manager, reporting directly to Mr. Sessions. By 1993, Carr had become Ferris's General Manager, and in April 1996, Carr became "Advisor to President" Sessions.

**ANSWER:**

Carr admits that (i) in August 1987, Carr became a chemical consultant for Ferris; and (ii) thereafter, he became a full-time Ferris employee, a part of Ferris's management and interacted, at times, directly with Mr. Sessions, then Ferris's President and CEO. Carr further admits that (i) in December 1991, he held the title of "Manager" at Ferris and reported directly to Mr. Sessions; (ii) in 1993, Carr become Ferris's "General Manager"; and (iii) in April 1996, Carr became an "Advisor" to Mr. Sessions. Carr denies any remaining allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 18:**

As a member of Ferris's senior management team, Carr was heavily involved with the conception, development and commercialization of Ferris's patent portfolio concerning wound

CHICAGO/#2663075.1

dressings. Indeed, Carr was a co-inventor on the following Ferris patents relating to wound dressings: U.S. Patent Nos. 6,794,554; 5,916,928; 5,605,165; 5,254,301; 5,065,752; 5,064,653.

**ANSWER:**

Carr admits that as a member of Ferris's management team, he was involved in the conception, development and commercialization of certain patents owned by Ferris concerning wound dressings. Carr further admits that he was listed as "co-inventor" on U.S. Patent Nos. 6,794,554; 5,916,928; 5,605,165; 5,254,301; 5,065,752; and 5,064,653 for wound dressings. Carr denies any remaining allegations contained in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 19:**

In addition to his work as a co-inventor and developer of Ferris's wound dressings, Carr was responsible for Ferris's patent procurement program. In this role, he closely worked with other Ferris inventors (including Mr. Sessions) and Ferris's outside patent counsel regarding Ferris's patent - strategies. He also assisted counsel in responding to Office Actions from the United States Patent and Trademark Office ("USPTO"), including analyzing the scope of the proposed patent claims and third-party patents and other references relating to Ferris's pending patent applications.

**ANSWER:**

Carr admits that he, when requested by Ferris (i) was involved in Ferris's patent procurement program; (ii) worked with other inventors and outside patent counsel; and (iii) provided information to outside patent counsel in response to Office Actions from the United States Patent and Trademark Office. Carr denies any remaining allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 20:**

Carr also regularly communicated with the Food and Drug Administration on Ferris's behalf. In particular, he responded to the FDA's comments regarding Ferris's labeling for

PolyMem. In addition, he was involved with Ferris's product certification registration. Carr also regularly corresponded with potential clients regarding pricing and cost of Ferris's wound dressings. Moreover, he was responsible for Ferris's proprietary manufacturing operations and methods of productions.

**ANSWER:**

Carr admits that he, when requested by Ferris, (i) communicated, on occasion, with the Food and Drug Administration on Ferris's behalf, including responding to comments regarding Ferris's labeling for PolyMem; and (ii) was involved with Ferris's product certification registration. Carr further admits that he corresponded with potential clients regarding pricing and cost of Ferris's wound dressings. Carr denies any remaining allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 21:**

In June 1999, Carr became Vice President of Operations and General Manager of Ferris. In this role, he was responsible for, among other things, applying for and following up with patent applications and other legal issues.

**ANSWER:**

Carr admits only that Ferris rehired him in 1999 as Vice President of Operations and General Manager of Ferris after Carr spent three years as General Manager of SteriGenics International. Carr denies any remaining allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 22:**

Carr also was involved in the development of new Ferris products. Indeed, one of Carr's objectives was to introduce new products.

**ANSWER:**

Carr admits that he, when requested by Ferris, became involved in the development and introduction of new products at Ferris. Carr denies any remaining allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 23:**

As Vice President of Operations and General Manager, Carr was responsible for protecting Ferris's confidential information. He regularly signed Ferris's Visitors' Agreements Regarding Confidentiality and Nondisclosure on behalf of the company, which acknowledged that visitors to Ferris could view "certain confidential information, techniques and specific parameters used in medical device or other manufacturing . . . ." Ferris required its visitors to "maintain all knowledge of such Confidential information in strict confidence."

**ANSWER:**

Carr admits that Ferris sometimes required him to countersign, on behalf of Ferris, certain agreements calling for the protection of information that Ferris claimed to be confidential. Carr denies any remaining allegations that are different from or contrary to, or which seek to characterize or draw legal conclusions from, the express terms of those agreements. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 24:**

As Vice President of Operations and General Manager of Ferris, Carr also was responsible for monitoring Ferris employees' obligation to keep its proprietary information confidential. For example, on September 19, 2000, Carr issued a "Memorandum to All [Ferris] Employees regarding Ferris Confidential Information," stating:

> [A]ll employees have an obligation to hold in strictest confidence
> the Company's trade secrets and other proprietary or confidential
> business information; an obligation not to use the Company's trade
> secrets and other proprietary or confidential business information
> for their own benefit or for the benefit of others; and an obligation
> not to reveal, divulge, or disclose the Company's trade secrets and
> other proprietary or confidential business information to any

9

person, firm or corporation without the written authorization of an
officer of Ferris.

(Ex. A, 9/19/00 Carr Memorandum).

**ANSWER:**

Carr admits that Ferris required him to issue a memorandum to other employees calling for the protection of information that Ferris claimed to be confidential. Carr denies any remaining allegations in this paragraph that are different from or contrary to, or which seek to characterize or draw legal conclusions from, the express terms of the memorandum. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 25:**

As Vice President of Operations and General Manager, Carr also was heavily involved in Ferris's day-to-day management. For example, he signed Domestic Distribution Agreements on Ferris's behalf and participated in managerial review of Ferris's product development.

**ANSWER:**

Carr admits, on information and belief, that he may have signed a Domestic Distribution Agreement" on behalf of Ferris when instructed by Ferris to do so. Carr further admits that he was involved in Ferris management and participated in managerial reviews of Ferris's product development. Carr denies any remaining allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 26:**

In 2002, Carr became Ferris's Chief Operating Officer, second only to Mr. Sessions, and in April 2003 he became "Aide to CEO" Sessions.

10

**ANSWER:**

Carr admits that he became Ferris's Chief Operating Officer in 2002, which Ferris's CEO considered to be a demotion. Carr denies any remaining allegations in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

## CARR REPEATEDLY AGREES TO PROTECT FERRIS' CONFIDENTIAL INFORMATION AND ASSIGN INVENTIONS TO FERRIS

**ALLEGATION NO. 27:**

From the time he first worked with Ferris as a consultant, Carr acknowledged that "during the course of [his] association with Ferris, [he] may acquire or have access to information that is confidential and of great value to Ferris" . . . including "research and/or development projects as well as data relating to them" and "formulations, designs, products, processes, supplies, [and] methods of manufacture . . . ." (Ex. B, 8/6/87 Nonemployee Security Agreement ¶1(a)). He promised to "use Ferris' confidential information only for the direct and sole benefit of Ferris . . . [and] not disclose Ferris' confidential information to others without the express written authorization of Ferris." (*Id.* ¶1(b)). He also promised "not to show or display to any third party" any "drawings, samples, prototypes, products or equipment" that incorporates "Ferris' specifications or ideas or technology." (*Id.* ¶3).

**ANSWER:**

Carr admits that he signed the agreement attached as Exhibit B to the Complaint, which expired by its own terms in 1997. Carr denies any remaining allegations that are different than or contrary to, or which seek to characterize or draw legal conclusions from, the express terms of the agreement. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 28:**

Moreover, as Vice President of Operations and General Manager, Carr was responsible for administering the "Ferris Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement," which all current and future Ferris employees, including Carr, were required to sign. That agreement required all employees to assign their rights, title and interest in any inventions conceived, developed or reduced to practice during employment that relate to Ferris' business and were developed on Ferris' time or with Ferris "equipment, supplies,

11

facilities or trade secret information" or "which resulted from any work . . . performed for Ferris." (Ex. C at ¶ 2.2(a)).

**ANSWER:**

Carr admits only that a copy of the "Ferris Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement" is attached as Exhibit C to the Complaint. Carr denies that he was responsible for administering the "Ferris Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement" and that all current and future Ferris employees, including Carr, were required to sign it. Carr further denies any remaining allegations contained in this paragraph that are different than or contrary to, or which seek to characterize or draw legal conclusions from, the express terms of the agreement. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 29:**

Under the Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement, employees also recognized "that Inventions relating to my activities while working for Ferris and conceived by me . . . *within one year after termination of my employment . . . shall be presumed to have been conceived during my employment with Ferris and are to be assigned to Ferris as a Ferris invention . . . .*" (*Id.* ¶ 2.2(b)) (emphasis added).

**ANSWER:**

Carr admits only that a copy of the "Ferris Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement" is attached as Exhibit C to the Complaint. Carr denies that he was responsible for administering the "Ferris Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement" and that all current and future Ferris employees, including Carr, were required to sign it. Carr further denies any remaining allegations contained in this paragraph that are different than or contrary to, or which seek to characterize or draw legal conclusions from, the express terms of the agreement. Curaline is

12

without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 30:**

As Vice President of Operations and General Manager, Carr regularly signed the Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement on Ferris's behalf. (*See Id.*).

**ANSWER:**

Carr admits that he signed, at Ferris's request, the "Ferris Employee Confidentiality, Assignment of Inventions and Nonsolicitation Agreement" that is attached as Exhibit C to the Complaint. Carr denies any remaining allegations contained in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 31:**

On several occasions during his employment at Ferris, Carr also acknowledged receipt of the Ferris Employee Handbook. These Handbooks acknowledged that "[e]mployees of Ferris will have access to confidential information. We believe the employment relationship creates a relationship of trust with respect to any information regarding the business of Ferris. . . ." (*See, e.g.,* Ex. D, April 2003 Ferris Employee Handbook).

**ANSWER:**

Carr admits that he acknowledged receipt of Ferris's April 2003 Employee Handbook which is attached as Exhibit D to the Complaint. Carr further denies any remaining allegations contained in this paragraph that are different than or contrary to, or which seek to characterize or draw legal conclusions from, the express terms of the acknowledgment and/or the Employee Handbook. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

## CARR BREACHES HIS EMPLOYMENT CONTRACT AND MISAPPROPRIATES FERRIS CONFIDENTIAL KNOWHOW IMMEDIATELY AFTER LEAVING FERRIS

### ALLEGATION NO. 32:

Carr left Ferris on June 6, 2003.

### ANSWER:

Carr denies that he "left" Ferris. Carr admits that Ferris terminated and escorted him out of the building on June 6, 2003. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

### ALLEGATION NO. 33:

A little over *one* month later, on July 16, 2003, Carr and another former Ferris employee, George Worthley, filed a confidential provisional patent application with the USPTO, No. 60/487,666 for "Novel Polyurethane Formulations and Applications." On June 30, 2004, Carr filed a continuing application claiming the benefit of Provision Appl. 60/487,666 for a "Foam-layered dressing, a method for making the same, a method for applying a dressing, a foam composition, and a foam layer composition produced by a process." (Ex. E, Pub. No. US2005/0013987 ("'987 Patent Application")). In the '987 Patent Application, Carr claimed he had invented a two-layer foam dressing:

> 1.  A foam-layered dressing prepared by a process comprising the steps of:
>
> (a)  providing a first foam layer;
>
> (b)  adding a slurry over the first foam layer wherein the slurry comprises a surfactant, an absorbent, a plasticizer and an active agent;
>
> (c)  curing the slurry and the first foam layer; and
>
> (d)  drying the slurry and the first foam layer until the slurry forms a second foam layer which attaches to the first foam layer.

(*Id.* at 5). In the prosecution of this application, the Patent Examiner cited several Ferris patents as prior art, including U.S. Patent Nos. 5,064,653, 5,065,752, and 5,916,928. Carr was the co-inventor on each of these patents.

14

**ANSWER:**

Carr admits the allegations contained in this paragraph, but denies that U.S. Patent Nos. 5,064,653, 5,065,752, and 5,916,928 were not disclosed to the Patent Examiner by Carr as prior art.  Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 34:**

The '987 Patent Application disclosed Ferris's confidential know-how, methods and procedures.  Carr derived the dual-layered foam dressing claimed in the '987 Patent Application from his work at Ferris.  As Ferris's Vice President of Operations and General Manager, Carr was regularly exposed to this Ferris confidential information.  In particular, under Carr's direction, Ferris had developed and tested a dual-layer foam wound dressing that administered a drug.

**ANSWER:**

Carr admits that he was, at one time, Vice President of Operations and General Manager of Ferris.  Carr denies any remaining allegations contained in this paragraph.  Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 35:**

Given the nature of the technology and polyurethane material involved, it would have been impossible for Carr to have independently invented and reduced to practice his alleged invention in the little over one month between when he left Ferris and filed the '987 Patent Application.

**ANSWER:**

Carr denies the allegations contained in this paragraph.  Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

15

**ALLEGATION NO. 36:**

The USPTO agreed that Carr's purported invention in the '987 Patent Application incorporated Ferris's proprietary know-how. Although not cited by Carr and Worthley, the USPTO twice rejected claim 1 of Carr's patent application as anticipated and obvious over Ferris's 5,254,301 patent.

**ANSWER:**

Carr admits only that the Patent Examiner twice rejected claim 1 of the '987 Patent Application as anticipated and obvious over Ferris's U.S. Patent No. 5,254,301. Carr denies any remaining allegations contained in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 37:**

Because the patent application process is not open to the public, Ferris was not aware Carr had filed the '987 Patent Application. Ferris also was not aware Carr had misappropriated Ferris's confidential information after he left Ferris. To the contrary, Ferris assumed that Carr abided by his contractual and fiduciary duties to the company. Thus, Ferris had no duty to inquire whether Carr had filed a patent application based on Ferris confidential information and know-how.

**ANSWER:**

Carr is without knowledge or information sufficient to form a belief as to the truth or falsity of what Ferris knew or did not know, or the extent of Ferris's duties, voluntary or otherwise. Carr denies any remaining allegations contained in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

**ALLEGATION NO. 38:**

On information and belief, Carr and Worthley assigned their rights in the '987 Patent Application to RC Medical, LLC. Carr was the President of RC Medical, LLC. In September, 2005, RC Medical filed a Correction of Ownership, removing Worthley as an inventor of the '987 Patent Application. The '987 Patent Application was later abandoned.

CHICAGO/#2663075.1

**ANSWER:**

Carr admits the allegations contained in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.

## FERRIS DISCOVERS CARR MISAPPROPRIATED ITS CONFIDENTIAL INFORMATION

**ALLEGATION NO. 39:**

Upon information and belief, in November 2012, Carr became the Chief Operating Officer of Curaline.

**ANSWER:**

Defendants admit the allegations contained in this paragraph.

**ALLEGATION NO. 40:**

Curaline recently began to market wound dressings, DevraSorb. DevraSorb Prime is "a layered foam product" "used for deep wounds." (Ex. F, DevraSorb™ Innovative Foam Dressings at 2).

**ANSWER:**

Defendants admit the allegations contained in this paragraph.

**ALLEGATION NO. 41:**

In its marketing materials, Curaline claims its DevraSorb Prime contains "two layers" to "absorb[] and hold[] significantly more fluid." (*Id.*).

**ANSWER:**

Defendants admit the allegations contained in this paragraph.

**ALLEGATION NO. 42:**

Both Curaline's marketing literature and its website claim "[a]ll DevraSorb products are patent-pending." (*Id.*; http://www.curaline.com/#!curaline-dievrasorb/c1jpw). The literature and website also state: "Curaline is on the front line of wound care with innovative ideas" and "dressings contain[ing] unique chemical compounds. . . ." (*Id.* at 4).

**ANSWER:**

Defendants admit the allegations contained in this paragraph.

**ALLEGATION NO. 43:**

In its November 30, 2012, 510(k) submission to the Department of Health and Human Services, Curaline claimed DevraSorb was the "substantial equivalent" to PolyMem, listing PolyMem as its "principal predicate."

**ANSWER:**

Defendants admit the allegations contained in this paragraph.

**ALLEGATION NO. 44:**

In mid-2013, Ferris discovered Carr was working at Curaline and that Curaline intended to offer a product similar to PolyMem. Upon learning Carr had joined Curaline, in June 2013, counsel for Ferris wrote a letter to Curaline's Chief Executive Officer, Haitham Matloub, advising him of Carr's ongoing duty to keep confidential Ferris's proprietary information. Counsel for Ferris also wrote to Carr individually to remind him of that duty.

**ANSWER:**

Defendants are without knowledge or information sufficient to form a belief as to the

truth or falsity of what Ferris did or did not discover or learn. Defendants admit that in or about

June 2013, they received a letter from Ferris's counsel. Defendants deny any remaining

allegations contained in this paragraph that are different than or contrary to, or which seek to

characterize or draw legal conclusions from, the express terms of the letter.

**ALLEGATION NO. 45:**

Curaline responded, denying any impropriety, but it failed to disclose that Carr had filed any patent applications upon leaving Ferris. Thus, both Carr and Curaline actively misled Ferris, took active steps to prevent Ferris from learning about their misappropriation and fraudulently concealed that they had misappropriated Ferris's confidential information and know- how.

18

**ANSWER:**

Defendants admits that Curaline responded to the letter sent by Ferris's counsel in June 2013 and that the response did not contain any reference to the '987 Patent.  Defendants deny any remaining allegations contained in this paragraph.

**ALLEGATION NO. 46:**

In November 2013, Ferris discovered Carr and Curaline were marketing DevraSorb.  At the Medica trade show in Germany, Ferris obtained DevraSorb marketing material that claimed its products were "patent-pending."  (Ex. F at 2).  Jeffrey Dziura, Curaline's Vice President of Sales and Marketing, also told a Ferris associate that Curaline had more "patent-pending" products in its "pipeline."

**ANSWER:**

Defendants deny that Curaline employs Jeffrey Dziura.  Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

**ALLEGATION NO. 47:**

In December 2013, Ferris began investigating Curaline's claims that its products were "patent-pending," which led to its discovery that Carr had misappropriated Ferris' confidential know-how that he had acquired while he was in Ferris' senior management.  In particular, in December 2013, Ferris first discovered that Carr had filed the '987 Patent Application that incorporated Ferris's confidential proprietary dual-layer foam wound dressing.

**ANSWER:**

Carr denies that he misappropriated Ferris's "confidential know-how" or that he "incorporated Ferris's confidential proprietary dual-layer foam wound dressing" into the '987 Patent.  Defendants are without knowledge or information sufficient to form a belief as to the truth or falsity of any remaining allegations contained in this paragraph.

CHICAGO/#2663075.1

## COUNT I – BREACH OF FIDUCIARY DUTY BY CARR

**ALLEGATION NO. 48:**

Ferris incorporates by reference, as though specifically pleaded herein, the allegations of each of the preceding paragraphs.

**ANSWER:**

Defendants incorporate their answers to paragraphs 1 through 47, above.

**ALLEGATION NO. 49:**

As Ferris's Vice President of Operations and General Manager, Carr owed Ferris a fiduciary duty of loyalty, fairness and honesty not to allow his personal interests to prevail over the interests of Ferris or usurp Ferris' corporate opportunity for personal gain or misappropriate a business opportunity or confidential information that properly belongs to Ferris. This duty continued after his termination because he began the exploitation before he resigned and it was based on confidential information learned while he was employed by Ferris and unlawfully took from Ferris when he left the company. In particular, Carr breached his fiduciary duty to Ferris by using Ferris company know-how, facilities or equipment while still employed by Ferris to develop a new business and make a profit for himself at Ferris's expense.

**ANSWER:**

Carr admits that, while he was employed as an officer at Ferris, he owed Ferris certain

fiduciary duties, namely the duties of care and loyalty. Carr denies any remaining allegations

contained in this paragraph. Curaline is without knowledge or information sufficient to form a

belief as to the truth or falsity of the allegations contained in this paragraph.

**ALLEGATION NO. 50:**

Carr willfully and deliberately breached his fiduciary duty to Ferris by misappropriating Ferris confidential and proprietary information he learned of while employed by Ferris and incorporating it in the provisional application he filed in July 2003, which resulted in the '987 Patent Application and which Curaline has incorporated into its DevraSorb product.

**ANSWER:**

Carr denies the allegations contained in this paragraph. Curaline is without knowledge or

information sufficient to form a belief as to the truth or falsity of the allegations contained in this

paragraph.

CHICAGO/#2663075.1

**ALLEGATION NO. 51:**

Both Carr and Curaline purposefully concealed Carr's breach of fiduciary duty. As discussed above, Ferris contacted both Carr and Curaline as soon as it discovered Carr was working at Curaline and that Curaline intended to offer a product similar to PolyMem. Curaline responded, denying any impropriety, but it failed to disclose that Carr had filed any patent applications upon leaving Ferris. Ferris reasonably relied upon Carr's and Curaline's representations that its new product, which was not yet on the market, did not incorporate any of Ferris's confidential information and know-how. By failing to inform Ferris of Carr's prior patent applications, both Carr and Curaline fraudulently concealed that they had misappropriated Ferris's confidential information and know-how.

**ANSWER:**

Defendants deny the allegations contained in this paragraph.

**ALLEGATION NO. 52:**

Carr's breach of fiduciary duty was also inherently undiscoverable. The '987 Patent Application was confidential when Carr filed it. There is no way that Ferris could have discovered Carr's misappropriation of its confidential information and know-how before Curaline began marketing Devrasorb in 2013.

**ANSWER:**

Carr admits that the '987 Patent Application was initially submitted as confidential but

made public in January 2005. Carr denies any remaining allegations contained in this paragraph.

Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity

of the allegations contained in this paragraph.

**ALLEGATION NO. 53:**

Ferris has been, and will continue to be, substantially and irreparably injured by Carr's willful and deliberate breach of his fiduciary duty because sales of Ferris' PolyMem product have been diverted by the sale of Curaline's DevraSorb.

**ANSWER:**

Defendants deny the allegations contained in this paragraph.

**ALLEGATION NO. 54:**

Carr's willful breach of his fiduciary duty to Ferris is the proximate cause of Ferris's injury, which is objectively verifiable.

**ANSWER:**

Defendants deny the allegations contained in this paragraph.

## COUNT II – BREACH OF CONTRACT BY CARR

**ALLEGATION NO. 55:**

Ferris incorporates by reference, as though specifically pleaded herein, the allegations of each of the preceding paragraphs.

**ANSWER:**

Defendants incorporate their answers to paragraphs 1 through 54, above.

**ALLEGATION NO. 56:**

Carr entered into an Employee Confidentiality, Assignment of Inventions and Nonsoliciation [sic] Agreement with Ferris in which he agreed to assign any inventions developed during his employment and one year after his termination to Ferris.

**ANSWER:**

Carr denies the allegations contained in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

**ALLEGATION NO. 57:**

Carr breached that agreement by filing a provisional patent application containing Ferris' confidential and proprietary information just over one month after leaving Ferris; filing a continuing application based on that provisional application and disclosing that confidential information to Curaline.

**ANSWER:**

Carr denies the allegations contained in this paragraph. Curaline denies that Carr disclosed any "confidential information" to Curaline. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of any remaining allegations contained in this paragraph.

CHICAGO/#2663075.1

**ALLEGATION NO. 58:**

Both Carr and Curaline purposefully concealed Carr's breach of contract. As discussed above, Ferris contacted both Carr and Curaline as soon as it discovered Carr was working at Curaline and that Curaline intended to offer a product similar to PolyMem. Curaline responded, denying any impropriety, but it failed to disclose that Carr had filed any patent applications upon leaving Ferris. Ferris reasonably relied upon Carr's and Curaline's representations that its new product, which was not yet on the market, did not incorporate any of Ferris's confidential information and know-how. By failing to inform Ferris of Carr's prior patent applications, both Carr and Curaline fraudulently concealed that they had misappropriated Ferris's confidential information and know-how.

**ANSWER:**

Defendants deny the allegations contained in this paragraph.

**ALLEGATION NO. 59:**

Carr's breach of contract was also inherently undiscoverable. The '987 Patent Application was confidential when Carr filed it. Furthermore, there is no way that Ferris could have discovered Carr's misappropriation of its confidential information and know-how before Curaline began marketing Devrasorb in 2013.

**ANSWER:**

Carr admits that the '987 Patent Application was initially submitted as confidential. Carr denies any remaining allegations contained in this paragraph. Curaline is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this paragraph.

**ALLEGATION NO. 60:**

Carr's breach injured Ferris because sales of its PolyMem product are being diverted to Curaline because its confidential information has been incorporated into Curaline's DevraSorb product.

**ANSWER:**

Defendants deny the allegations contained in this paragraph.

**ALLEGATION NO. 61:**

Carr's breach of contract is the proximate cause of Ferris's injury, which is objectively verifiable.

**ANSWER:**

Defendants deny the allegations contained in this paragraph.

## COUNT III – 15 U.S.C. § 1125(A) FALSE DESIGNATION OF ORIGIN BY CURALINE

**ALLEGATION NO. 62:**

Ferris repeats and hereby incorporates by reference, as though specifically pleaded herein, the allegations of each of the preceding paragraphs.

**ANSWER:**

Defendants incorporate their answers to paragraphs 1 through 61, above.

**ALLEGATION NO. 63:**

By representing to the market that its DevraSorb products are innovative and unique, Curaline has falsely represented the origin and nature of DevraSorb products in violation of 15 U.S.C. § 1125(a). Further, Curaline has falsely designated the origin of the DevraSorb products by failing to disclose that they are based on or derived from know-how that Carr had misappropriated from Ferris.

**ANSWER:**

Defendants deny the allegations contained in this paragraph.

**ALLEGATION NO. 64:**

Curaline has caused its advertisements and DevraSorb products to enter interstate commerce by offering them for sale on the Internet and at national and international industry trade shows.

**ANSWER:**

Defendants admit that Curaline has advertised its products on the Internet and attended national and international industry trade shows. Defendants deny any remaining allegations contained in this paragraph.

**ALLEGATION NO. 65:**

Ferris has been and will be substantially and irreparably injured by the sale of DevraSorb products because sales of its PolyMem products have been diverted to Curaline.

**ANSWER:**

Defendants deny the allegations contained in this paragraph.

## AFFIRMATIVE DEFENSES

As and for their Affirmative Defenses to Ferris's Complaint, Defendants state as follows:

### FIRST AFFIRMATIVE DEFENSE

Counts I and II of Ferris's Complaint are barred by the applicable statutes of limitation for breach of contract (ten years) and breach of fiduciary duty (five years). Ferris knew or should have known of any alleged breaches when Ferris decided to involuntarily terminate Carr in 2003 and/or when the '987 Patent Application became public in 2005.

### SECOND AFFIRMATIVE DEFENSE

Counts I of Ferris's Complaint is barred by the statute of frauds to the extent that Ferris seeks to enforce alleged obligations against Carr that could not be performed within one year.

### THIRD AFFIRMATIVE DEFENSE

Counts I and II of Ferris's Complaint are barred by the doctrine of laches. Ferris knew or should have known of any alleged breaches of contract and/or fiduciary duty by Carr when Ferris decided to involuntarily terminate Carr in June 2003, yet waited until 2014 to pursue its alleged rights.

### FOURTH AFFIRMATIVE DEFENSE

Ferris's claim for damages is barred in whole or part under the doctrine of mitigation of damages. On information and belief, Ferris has not taken any reasonable steps to mitigate any of its alleged damages.

CHICAGO/#2663075.1

WHEREFORE, Defendants Roy Carr and Curaline, Inc. respectfully request that the Court enter judgment in their favor and against Plaintiff Ferris Mfg. Corp. on all counts contained in the Complaint, together with an award of their reasonable attorneys' fees and costs.

Respectfully submitted,

/s/ Chad A. Schiefelbein
Chad A. Schiefelbein
Vedder Price P.C.
222 North LaSalle Street
Suite 2600
Chicago, Illinois  60601-1003
(312) 609-7500
cschiefelbein@vedderprice.com

*Attorneys for Defendants*
*Roy Carr and Curaline, Inc.*

CHICAGO/#2663075.1

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that he electronically filed the foregoing **DEFENDANTS ROY CARR AND CURALINE, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF FERRIS MFG. CORP.'S ORIGINAL COMPLAINT** on February 10, 2015, with the Clerk of the Court using the CM/ECF system.  As such, this document has been electronically served on all counsel of record via the CM/ECF system.

/s/ Chad A. Schiefelbein
Chad A. Schiefelbein